1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                       FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    DERRICK RAY CALDWELL                    No.  2:19-cv-0023 JAM DB

12                    Petitioner,

13          v.                                FINDINGS AND RECOMMENDATIONS

14    SCOTT FRAUENHEIM,

15                    Respondent.

16

17          Petitioner, a state prisoner, proceeds pro se and in forma pauperis with a petition for a writ

18   of habeas corpus under 28 U.S.C. § 2254. Petitioner challenges a judgment of convictions entered

19   on April 14, 2016 in the Solano County Superior Court. Petitioner was convicted of robbery in

20   the second-degree (Cal. Penal Code § 211) and assault by means of force likely to produce great

21   bodily injury (Cal. Penal Code § 245(a)(4)), with three prior convictions. Petitioner claims that

22   there was insufficient evidence of force likely to cause great bodily injury as to the assault

23   offense, and the prosecution engaged in prejudicial misconduct by implicitly referring to his

24   failure to testify and improperly shifting the burden of proof. For the reasons set forth below, it is

25   recommended that the petition be denied.

26   ////

27   ////

28   ////

1

**BACKGROUND**

2

I.    **Facts Established at Trial**

3          The California Court of Appeal for the First Appellate District provided the following

4    summary of the facts presented at trial:

5                   Around 8:15 p.m. on November 15, 2015, D.C. and L.W., two
6               employees of Buffalo Wild Wings at the Solano Mall in Fairfield,
                were taking a cigarette break behind the restaurant. As the two talked,
7               D.C. was also sending text messages on his cell phone.

8                   A man wearing a gray sweatshirt with the hood covering most of his
                upper face, gray sweatpants, and gray shoes approached the two
9               employees. L.W. asked him if she could help him "because he wasn't
                dressed in a typical uniform or anything that would convey he
                worked at the mall." L.W. described the man as an African American
10              with "[m]edium to dark" skin in his late twenties or early thirties who
                was at least six feet tall, had a "thinner frame," and had "stubbly"
11              facial hair, and at trial she identified him as Caldwell. Similarly, D.C.
                described the man, whom he also identified as Caldwell at trial, as a
12              tall African American with "[d]ark" skin in his late thirties or early
                forties who had a normal build and "scruffy" facial hair.
13
                    After asking L.W. how her night was going, Caldwell snatched the
14              cell phone from D.C.'s hands. D.C. tried to retrieve his phone by
                grabbing for it, at which point Caldwell punched him in the face, and
15              D.C. "stumble[d] down to the ground" onto his hands and knees. As
                D.C. tried to get up, Caldwell kicked him in the face, knocking D.C.'s
16              glasses off and causing D.C. to stumble again.

17                  Meanwhile, L.W. opened the restaurant's back door and called for
                help. J.B., a manager at the restaurant, came outside and saw
18              Caldwell, whom J.B. described as about six feet tall with a slim build
                and "[d]ark" skin, fighting D.C.[1] J.B. chased Caldwell across the
19              parking lot as Caldwell fled with the cell phone. As they were
                running up some steps, both J.B. and Caldwell fell, and Caldwell
20              kicked J.B. in the face, causing his nose to bleed. Caldwell was able
                to escape, and J.B. called 911.
21
                    Officers Bee Xiong and Robert Piro of the Fairfield Police
22              Department responded to Buffalo Wild Wings soon after the robbery
                and assault occurred. J.B. gave a brief description of the suspect,
23              which Officer Xiong described as "the same description that was
                given out to dispatch, a black male adult approximately six feet tall,
24              wearing ... a gray sweater ... and dark-colored pants." Later, the
                officer reviewed a copy of a security video recording from the
25              restaurant, which showed Caldwell "lunge[ ]" at D.C. as he wound
                up his arm to punch D.C. before the two men moved out of the
26              camera's view, followed by "a brief scuffle" between them and J.B.'s

27    ───────────────────

[1] J.B. did not identify Caldwell at trial, indicating that he did not get a good enough look at the
28    suspect's face.

pursuit of Caldwell.[2] The copy of the recording was played for the jury.

Officers Xiong and Piro used the "Find My iPhone" application on J.B.'s cell phone to track D.C.'s cell phone. The application initially showed that D.C.'s phone was in the bushes near a Ross store in the mall, and Officer Piro checked that location but did not find anything. Officer Xiong then informed Officer Piro that the application "was pinging in the area of Northbay Medical Center." Both officers responded to the parking lot of the medical center's offices, which were closed for the night.

Officer Xiong spotted Caldwell lying in the driver's seat of a car parked in the lot. Caldwell was wearing a dark-colored shirt and pants, and a black jacket covered his torso and face. Officer Xiong testified that although it was a cold night, Caldwell was sweating, and he did not appear to be under the influence of a controlled substance. The officer called D.C.'s number and heard the phone ringing inside Caldwell's car. Officer Xiong then retrieved the phone from the car's glove compartment. The car was full of clothing, but the officers were unable to find any clothing that matched the witnesses' description of what the suspect had been wearing.

After the officers detained Caldwell, whose driver's license said that he was six feet, three inches tall, a third Fairfield police officer took D.C. to the Northbay Medical Center parking lot to see whether D.C. could identify Caldwell. The officer gave D.C. a standard admonishment not to assume that Caldwell was the suspect merely because he was in custody. D.C. indicated he was unsure whether Caldwell was the suspect because Caldwell was wearing different clothes. After moving closer, D.C. recognized Caldwell's facial features and identified him as the suspect.

Shortly afterward, Caldwell was brought outside the Buffalo Wild Wings for two other showups. First, L.W. was asked to identify him and given the same admonishment that D.C. received. After she commented that Caldwell was wearing different clothes than the suspect's, a police officer told her that "sometimes they do change their clothes" and asked her "to focus on [Caldwell's] face and his height." She then identified Caldwell, telling the police that she was "99 to a hundred percent certain." At trial, she testified that she was now around "75 percent sure" about the identification.

J.B. was also asked to identify Caldwell after being read the same admonishment. J.B. testified that at the time, he told the police that " 'it looks like him' " and that Caldwell matched the description but that the clothing was different and J.B. was not " 'a hundred percent sure' " about the identification.

Dr. Robert Shomer, Ph.D., an experimental psychologist, testified for the defense as an expert in memory perception and eyewitness

---

[2] The original recording was erased before the police requested it, but the restaurant was able to provide a manager's cell phone recording of portions of the footage.

3

1    identification. He stated that several factors can bear on the reliability
2    of an identification, including the lighting, the witness's stress level
     and opportunity to observe, and whether the witness has
3    characteristics similar to those of the person being identified. He
     testified that field showups, the procedure used here, are "extremely
4    problematic" because they are "inherently suggestive." He also
     testified that "there is no usable relationship between how confident
5    and sure somebody is of their eye[]witness ID and the actual
     accuracy of that ID" and noted that to date 330 people had been
6    exonerated of crimes after being erroneously identified. He made
     clear, however, that he was not offering an opinion on whether a
7    particular witness's identification was accurate. Caldwell did not
     testify.

8    (ECF No. 17-6 at 85–88); People v. Caldwell, No. A148195, 2017 WL 4129190, at *1–2 (Cal. Ct.

9    App. Sept. 19, 2017).

10   **II.    Procedural Background**

11       **A.   Judgment**

12       A jury convicted petitioner of second-degree robbery and assault by means of force likely

13   to produce great bodily injury, and the trial court found as true that he had three prior convictions.

14   (ECF No. 17-3 at 181–82, 185, 187.) The trial court imposed an aggregate prison term of eight

15   years. (Id. at 201.)

16       **B.   State Appeal and Federal Proceedings**

17       Petitioner timely appealed his convictions, raising three claims: (1) petitioner was denied

18   his right to due process by filing of an information charging an offense not in the complaint and

19   not supported by probable cause at the preliminary hearing; (2) there was insufficient evidence of

20   force likely to cause great bodily injury as to the assault offense; and (3) prosecution engaged in

21   prejudicial misconduct by making a Griffin[3] error by implicitly referring to defendant's failure to

22   testify and improperly shifting the burden of proof. (ECF No. 17-6 at 3–33.) The California Court

23   of Appeal denied his claims on September 19, 2017. (Id. at 85–99.) Petitioner sought review in

24   the California Supreme Court. (Id. at 101–17.) On January 10, 2018, the California Supreme

25   Court summarily denied review. (Id. at 137.) Petitioner did not seek collateral review. The present

26   petition was filed on December 10, 2018, and Respondent has filed an answer. (ECF No1. 1, 17.)

27

28   [3] Griffin v. California, 380 U.S. 609 (1965).

4

**STANDARDS OF REVIEW APPLICABLE TO HABEAS CORPUS CLAIMS**

A court can entertain an application for a writ of habeas corpus by a person in custody under a judgment of a state court on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for an alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67–68 (1991); Park v. California, 202 F.3d 1146, 1149 (9th Cir. 2000) (stating that "a violation of state law standing alone is not cognizable in federal court on habeas.").

This court may not grant habeas corpus relief unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Greene v. Fisher, 565 U.S. 34, 37 (2011); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). Circuit court precedent "'may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably.'" Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). But it may not be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64 (2013) (per curiam) (citing Parker v. Matthews, 567 U.S. 37 (2012)); see also Carey v. Musladin, 549 U.S. 70, 76–77 (2006). Nor may circuit precedent be used to "determine whether a particular rule of law is so widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court, be accepted as correct." Marshall, 569 U.S. at 64.

A habeas corpus application can invoke § 2254(d)(1) in two ways. First, a state court decision is "contrary to" clearly established federal law if it either applies a rule that contradicts a holding of the Supreme Court or reaches a different result from Supreme Court precedent on

1   "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003) (quoting

2   Williams, 529 U.S. at 405–06). Second, "under the 'unreasonable application' clause, a federal

3   habeas court may grant the writ if the state court identifies the correct governing legal principle

4   from th[e] [Supreme] Court's decisions but unreasonably applies that principle to the facts of the

5   prisoner's case.'" Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at

6   413); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). "[A] federal habeas court may not

7   issue the writ simply because that court concludes in its independent judgment that the relevant

8   state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that

9   application must also be unreasonable." Williams, 120 S. Ct. at 1522; see also Schriro v.

10  Landrigan, 550 U.S. 465, 473 (2007); Andrade, 538 U.S. at 75. "A state court's determination

11  that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could

12  disagree' on the correctness of the state court's decision." Harrington v. Richter, 562 U.S. 86, 101

13  (2011) (quoting Yarborough v. Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a

14  condition for obtaining habeas corpus from a federal court, a state prisoner must show that the

15  state court's ruling on the claim being presented in federal court was so lacking in justification

16  that there was an error well understood and comprehended in existing law beyond any possibility

17  for fairminded disagreement." Richter, 562 U.S. at 786–87.

18       A petitioner may also challenge a state court's decision as being an unreasonable

19  determination of facts under § 2254(d)(2). Hibbler v. Benedetti, 693 F.3d 1140, 1146 (9th Cir.

20  2012). Challenges under this clause fall into two categories; first, the state court's findings of fact

21  "were not supported by substantial evidence in the state court record," or second, the "fact-

22  finding process itself" was "deficient in some material way." Id.; see also Hurles v. Ryan, 752

23  F.3d 768, 790–91 (9th Cir. 2014) (If a state court makes factual findings without an opportunity

24  for the petitioner to present evidence, the fact-finding process may be deficient and the state court

25  opinion may not be entitled to deference.). Under the "substantial evidence" category, the court

26  asks whether "an appellate panel, applying the normal standards of appellate review," could

27  reasonably conclude that the finding is supported by the record. Hibbler, 693 F.3d at 1146 (9th

28  Cir. 2012) (quoting Taylor v. Maddox, 366 F.3d 992, 999–1000 (9th Cir. 2004), overruled on

other grounds by Murray v. Schriro, 745 F.3d 984, 999–1001 (9th Cir. 2014)). The "fact-finding process" category, however, requires the federal court to "be satisfied that any appellate court to whom the defect [in the state court's fact-finding process] is pointed out would be unreasonable in holding that the state court's fact-finding process was adequate." Hibbler, 693 F.3d at 1146-47 (quoting Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)). The state court's failure to hold an evidentiary hearing does not automatically render its fact-finding process unreasonable. Id. at 1147. Further, a state court may make factual findings without an evidentiary hearing if "the record conclusively establishes a fact or where petitioner's factual allegations are entirely without credibility." Perez v. Rosario, 459 F.3d 943, 951 (9th Cir. 2006) (citing Nunes v. Mueller, 350 F.3d 1045, 1055 (9th Cir. 2003)).

If a petitioner overcomes one of the hurdles posed by section 2254(d), this court reviews the merits of the claim de novo. Delgadillo v. Woodford, 527 F.3d 919, 925 (9th Cir. 2008); see also Frantz v. Hazey, 533 F.3d 724, 737 (9th Cir. 2008) (en banc). For claims upon which a petitioner seeks to present new evidence, the petitioner must meet the standards of 28 U.S.C. § 2254(e)(2) by showing that he has not "failed to develop the factual basis of [the] claim in State court proceedings" and by meeting the federal case law standards for the presentation of evidence in a federal habeas proceeding. See Cullen v. Pinholster, 563 U.S. 170, 186 (2011).

This court looks to the last reasoned state court decision as the basis for the state court judgment. Stanley, 633 F.3d at 859; Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). "[I]f the last reasoned state court decision adopts or substantially incorporates the reasoning from a previous state court decision, [this court] may consider both decisions to 'fully ascertain the reasoning of the last decision.'" Edwards v. Lamarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc) (quoting Barker v. Fleming, 423 F.3d 1085, 1093 (9th Cir. 2005)). "When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." Richter, 562 U.S. at 99. This presumption may be overcome if "there is reason to think some other explanation for the state court's decision is more likely." Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)). Similarly, when a state court

1    decision rejects some of petitioner's claims but does not expressly address a federal claim, a

2    federal habeas court must presume, subject to rebuttal, that the federal claim was adjudicated on

3    the merits. Johnson v. Williams, 568 U.S. 289, 293 (2013). When it is clear that a state court has

4    not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. §

5    2254(d) does not apply, and a federal habeas court reviews the claim de novo. Stanley, 633 F.3d

6    at 860.

7                                                **ANALYSIS**

8           Petitioner asserts two grounds for relief: (1) there was insufficient evidence of force likely

9    to produce great bodily injury for the assault offense, and (2) the prosecution engaged in

10   misconduct by making a Griffin error by implicitly referring to defendant's failure to testify and

11   improperly shifting the burden of proof. (ECF No. 1.)

12   **I.      Claim Regarding Insufficient Evidence to Support Assault Conviction**

13          Petitioner claims that there is insufficient evidence of assault by means of force likely to

14   cause bodily injury to support his conviction. (ECF No. 1 at 4; see also ECF No. 17-6 at 23–26.)

15   The state disagrees, arguing that the state court reasonably concluded that there was sufficient

16   evidence to support the conviction. (ECF No. 17-1 at 8–11.)

17          **A.  State Court Opinion**

18          Petitioner raised this claim in his direct appeal. In the last reasoned state court decision,

19   the California Court of Appeal considered and rejected the claim:

20                  Section 245, subdivision (a)(4) makes it a crime to "commit[ ] an
                    assault upon the person of another by any means of force likely to
21                  produce great bodily injury." "Great bodily injury" is defined as
                    "bodily injury which is significant or substantial, not insignificant,
22                  trivial or moderate." (*People v. McDaniel* (2008) 159 Cal.App.4th
                    736, 748.) " 'The statute prohibits an assault by means of force likely
23                  to produce great bodily injury, not the use of force which does in fact
                    produce such injury. While ... the results of an assault are often highly
24                  probative of the amount of force used, they cannot be conclusive.' "
                    (*People v. Armstrong* (1992) 8 Cal.App.4th 1060, 1065–1066
25                  (*Armstrong* ); *see also People v. Golde* (2008) 163 Cal.App.4th 101,
                    123 [no requirement that victim sustain any bodily injury].) Whether
26                  an assault was committed by means of force likely to produce great
                    bodily injury is a question of fact for the jury. (*Armstrong*, at p.
27                  1066.)

28          ////

                                                    8

The use of hands or feet to inflict force can suffice to support a conviction of assault by means of force likely to produce great bodily injury. (*People v. Aguilar* (1997) 16 Cal.4th 1023, 1026, 1028; *see, e.g., Armstrong, supra*, 8 Cal.App.4th at p. 1066.) "Whether a fist [or foot] used in striking a person would be likely to cause great bodily injury is to be determined by the force of the impact, the manner in which it was used[,] and the circumstances under which the force was applied." (*People v. McDaniel, supra*, 159 Cal.App.4th at pp. 748–749.) We evaluate "the force actually used by the [defendant] to determine if it was likely to cause great bodily injury to the victim," not the threat posed based on "the force that the [defendant] could have used against the victim." (*People v. Duke* (1985) 174 Cal.App.3d 296, 303.)

In evaluating Caldwell's claim, " 'we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume in support of the judgment the existence of every fact the trier of fact reasonably could infer from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.' " (*People v. Covarrubias* (2016) 1 Cal.5th 838, 890.)

We conclude that there was substantial evidence of the use of force likely to produce great bodily injury. D.C. testified that Caldwell punched him in the face, after which he fell to the ground. Contrary to Caldwell's suggestion otherwise, the jury could reasonably infer from this testimony that the punching caused D.C. to fall. D.C. also testified that Caldwell then kicked him in the face, causing his glasses to fall off. Punching and kicking someone in the head, "an obviously vulnerable area," with sufficient force to make the person fall to the ground and knock off his or her glasses is a use of force likely to produce great bodily injury. (*People v. Saez* (2015) 237 Cal.App.4th 1177, 1189 [observing it was "significant" that victim sustained head injuries in concluding that substantial evidence supported jury's finding of great bodily injury]; *People v. Horton* (1963) 213 Cal.App.2d 185, 186, 188 ["kicking a man in the face and head" constitutes assault by means of force likely to produce great bodily injury].)

Caldwell argues that there was insufficient evidence he used force likely to produce great bodily injury because D.C. did not testify to being injured or requiring medical treatment. Citing *People v. Wells* (1971) 14 Cal.App.3d 348, he contends that "[b]ecause force was actually used, the nature and extent of the injury is the controlling factor in determining whether the assault was by means of force likely to cause great bodily injury." *Wells* observed that "the nature and extent of the injury is a relevant and often controlling factor in determining whether the force used was of felonious character." (*Id.* at p. 358.) That factor is not controlling here, however, given the circumstances. Caldwell's punching and kicking D.C. in the face could have easily caused serious injuries, and we agree with the

9

1
2
3
4

Attorney General that the fact D.C. "may have fortuitously escaped" harm "does not lessen [Caldwell's] liability." (*See People v. Golde, supra,* 163 Cal.App.4th at p. 123; *Armstrong, supra,* 8 Cal.App.4th at pp. 1065–1066.)

(ECF No. 17-6 at 89–91); Caldwell, 2017 WL 4129190, at *3–4.

## B. Discussion

5
6
7
8
9
10
11
12
13
14

A petitioner is entitled to habeas corpus relief "if it is found that upon the record adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979); see also Ngo v. Giurbino, 651 F.3d 1112, 1115 (9th Cir. 2011). If there are conflicting factual inferences, the federal habeas court must presume the jury resolved the conflicts in favor of the prosecution. Jackson, 443 U.S. at 326 ("[A] federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of prosecution, and must defer to that resolution."); McDaniel v. Brown, 558 U.S. 120, 133 (2010) (per curiam).

15
16
17
18
19
20
21

Although this court's review is grounded in due process under the Fourteenth Amendment, the Jackson standard "must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson, 443 U.S. at 324 n.16; Juan H. v. Allen, 408 F.3d 1262, 1275–76 (9th Cir. 2005). This court will look to state law to establish the elements the offense and then turn to the federal question of whether the state court was objectively unreasonable in concluding that sufficient evidence supported that conviction. See Johnson v. Montgomery, 899 F.3d 1052, 1056 (9th Cir. 2018).

22
23
24
25
26
27
28

"After AEDPA, we apply the standards of *Jackson* with an additional layer of deference." Juan H., 408 F.3d at 1274; see Coleman v. Johnson, 566 U.S. 650, 651 (2012) (per curiam). On direct appeal at the state level, "it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury." Cavazos v. Smith, 565 U.S. 1, 2 (2011) (per curiam). On habeas review, "a federal court may not overturn a state court decision rejecting a sufficiency of the evidence

challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was 'objectively unreasonable.'" Id. (quoting Renico v. Lett, 559 U.S. 766, 773 (2010)).

California Penal Code § 245(a)(4) requires evidence of an assault by any means of force likely to produce great bodily injury. "Great bodily injury is bodily injury which is significant or substantial, not insignificant, trivial or moderate." People v. Armstrong, 8 Cal. App. 4th 1060, 1066 (1992). Courts "look to the force *actually used* by the [defendant] to determine if it was likely to cause great bodily injury to the victim." People v. Duke, 174 Cal. App. 3d 296, 303 (1985). However, the crime is for "assault by means of force *likely* to produce bodily injury, not the use of force which does *in fact* produce such injury." Armstrong, 8 Cal. App. 4th at 1065 (citing People v. Muir, 244 Cal. App. 2d 589, 604 (1966)). The injuries from the assault are highly probative, but not conclusive, of the amount of force used. Id. For example, "[t]he force likely to produce bodily injury can be found where the attack is made by use of hands or fists." People v. McDaniel, 159 Cal. App. 4th 736, 748 (2008); see People v. Medellin, 45 Cal. App. 5th 519, 528 (2020) (noting that a solitary punch can constitute force likely to produce great bodily injury). In determining whether a fist would cause great bodily injury, courts look to "the force of the impact, the manner in which it was used and the circumstances under which the force was applied." Id. at 748–49. What constitutes great bodily harm is a question of fact for the jury. People v. Escobar, 3 Cal. 4th 740, 750 (1992). "If there is sufficient evidence to sustain the jury's finding of great bodily injury, we are bound to accept it, even though circumstances might reasonably by reconciled with a contrary finding." Id. (citations omitted).

Here, there is sufficient evidence to support the jury's finding that petitioner used force likely to produce great bodily injury. Petitioner approached D.C. and snatched his phone. (ECF No. 17-4 at 70.) When D.C. tried to get it back, petitioner punched him in the face, and D.C. stumbled to the ground on his hands and knees. (Id. at 70, 76.) D.C. then attempted to stand up, and petitioner kicked him in the face, knocking his glasses off. (Id. at 70, 76, 94.) Based on this evidence, it was not objectively unreasonable for the state court to conclude that petitioner's punch and kick to D.C.'s face constituted force likely to cause great bodily injury.

Petitioner argues that because actual force was used, the nature and extent of the injury is the controlling factor. (ECF No. 17-6 at 26.) He contends that because the victim did not actually suffer a significant or substantial injury, the assault conviction must be reversed. (Id.) This argument fails. This court agrees with the state appellate court that this factor is not controlling here. See Armstrong, 8 Cal. App. 4th at 1065 (stating that the injury resulting from the assault is probative, but not conclusive). Petitioner kicked and punched D.C. in the face, and his actions could have caused D.C. significant and substantial injury. The fact that D.C. was spared such injury should not lessen petitioner's liability for his criminal actions. This court concludes that the appellate court's determination that there was sufficient evidence to support the assault conviction was not objectively unreasonable and recommends denying habeas relief on this claim.

## II.      Claim Regarding Prosecutorial Misconduct

Petitioner claims that the prosecution engaged in prejudicial misconduct in closing argument by shifting the burden of proof and commenting on petitioner's right to remain silent in violation of his rights under the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 1 at 2; ECF No. 17-6 at 27–33.)

### A. State Court Opinion

Petitioner raised this claim in his direct appeal. In the last reasoned state court decision, the California Court of Appeal considered and rejected the claim:

> Caldwell also claims that the prosecutor committed misconduct in closing argument by (1) committing *Griffin* error by indirectly referring to Caldwell's failure to testify and (2) improperly shifting the burden of proof. We disagree.

> **1. Additional facts.**

> Caldwell challenges four sets of the prosecutor's comments, two made during the initial closing argument and two made during rebuttal argument. First, referring to Caldwell's presence in the medical center parking lot, the prosecutor argued,

>> Why was he there? What other reasonable explanation is there for him being in that parking lot? You have to look at his actions. He's sitting in a car with the seat leaned all the way back and a jacket draped over his body, including his face. He's hiding. He's hiding from the police. That's the only reasonable explanation [why] he would be positioned in a car that way.

...

> ... [T]here is no evidence of the defendant being anywhere else. The only evidence you have is that he was at that Buffalo Wild Wings. You don't have any evidence of him shopping at the mall somewhere at this time. You don't have any evidence of him going into Northbay Medical Center at this time. The only evidence you have is him at that Buffalo Wild Wings where three witnesses saw him, and in that Northbay parking lot where the two officers found him.

Later during the initial argument, the prosecutor stated,

> What Dr. Shomer also couldn't explain is why was the phone found in the defendant's car? He also can't explain why the defendant was in that Northbay parking lot that night. He can't explain why the defendant was sweating. He can't explain why the defendant matched the robber as seen on the video. He can't explain why the defendant matched the description that the witnesses initially gave to the police. That's because the defendant is guilty. When you add up all of those reasons, you only come to that conclusion.

Caldwell's trial counsel did not object to either set of comments.

On rebuttal, addressing the defense's argument that the police could have obtained other surveillance footage from the mall or collected fingerprints from Caldwell's car or D.C.'s cell phone, the prosecutor argued,

> If the police had done a through z, [Caldwell's trial counsel] would be asking, well, why didn't they do No. 1. It goes on and on and on, because it's a distraction from the evidence that you have before you, because what [Caldwell's trial counsel] can't explain is why was the cellphone found in his client's car? Why was it in the defendant's car when [Caldwell] was sitting right there next to it? [¶] What he can't explain or provide a reasonable explanation of is why three separate witnesses ID'd his client.

Caldwell's trial counsel objected, stating, "We ... don't have a burden here, and this is improper. It's burden shifting, and it's an attack on me from the start." The trial court overruled the objection but told the jury, "Ladies and gentlemen, you heard the evidence. It's up to you to decide what the facts are, but what the lawyers say is just argument." The prosecutor then concluded,

> What else [Caldwell's trial counsel] can't explain is why the defendant matches the description that the witnesses initially gave to the police. What's his reasonable explanation for that? He can't explain why the defendant matches the robber, as seen on the video.
>
> When you go back there, you're going to have the pictures. You're going to have the video. You have the [911] call. Look

at it, and you will see that [the] defendant is the same robber on the video.

What he can't explain is why the defendant was found no less than 45 minutes later, in the same area just a short distance away from where this robbery occurred, at a medical center that is closed. He has no reason to be there. They have no reasonable explanation for that.

They have no reasonable explanation of why he's sitting in the front seat of his car with the seat leaned all the way back and a jacket draped over himself trying to hide from the police. [¶] They have no reasonable explanation of why he is profusely sweating, and it's cold outside.

And finally, they have no reasonable explanation of why there is no evidence that he was anywhere else that night. That's because when you look at all the evidence that is before you, there is only one reasonable logical conclusion that this defendant, he walked up to [D.C.]. He punched him in the face. He kicked him to the ground, and he ran off with his cellphone, and because of that, I ask that you find him guilty.

After the prosecutor concluded and the jury left the courtroom, Caldwell's trial counsel reiterated his objection that the prosecutor's "comments in his rebuttal" constituted misconduct because they were an attempt to shift the burden of proof to the defense.

## 2. General legal standards.

A prosecutor's "improper comments" violate the federal Constitution if they " ' "so infect[ ] the trial with unfairness as to make the resulting conviction a denial of due process." ' [Citations.] ' "But conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves ' "the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury." ' " ' " (*People v. Cunningham* (2001) 25 Cal.4th 926, 1000.) In a claim involving comments to the jury, " 'the question is whether there is a reasonable likelihood that the jury construed or applied any of the complained-of remarks in an objectionable fashion.' " (Id. at p. 1001.) In resolving this question, " 'we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 667 (*Centeno* ).)

" '[I]t is improper for the prosecutor to misstate the law generally [citation], and particularly to attempt to absolve the prosecution from its prima facie obligation to overcome reasonable doubt on all elements.' " (*People v. Hill* (1998) 17 Cal.4th 800, 829–830.) Specifically, it is improper "for the prosecutor to suggest that a 'reasonable' account of the evidence satisfies the prosecutor's burden of proof" or "to state that 'a defendant has a duty or burden to produce evidence, or a duty or burden to prove his or her innocence.' " (*Centeno, supra*, 60 Cal.4th at pp. 672–673.) In addition, under

14

Griffin, "it is error for a prosecutor to state that certain evidence is uncontradicted or unrefuted when that evidence could not be contradicted or refuted by anyone other than the defendant testifying on his or her own behalf" or "to refer to the absence of evidence that only the defendant's testimony could provide." (*People v. Hughes* (2002) 27 Cal.4th 287, 371–372.)

### 3. The prosecutor did not commit *Griffin* error or improperly shift the burden of proof.

Initially, the Attorney General contends that Caldwell forfeited his claim of *Griffin* error because he did not object on that basis and his claim of improper burden shifting to the extent the claim encompasses remarks the prosecutor made in the initial closing argument, to which Caldwell also did not object. Caldwell responds that he fairly raised the *Griffin* issue through his burden-shifting objection. We need not resolve the parties' dispute about whether Caldwell preserved his claims because they fail on the merits.

Caldwell claims that the prosecutor "commented inferentially on [Caldwell's] failure to testify" because "[o]nly [Caldwell] could testify as to why he was in the parking lot, why he was sweating, if he was somewhere else, and why the phone was in his car." The *Griffin* rule does not apply, however, "to comments on the state of the evidence, or on the failure of the defense to introduce material evidence or to call logical witnesses." (*People v. Medina* (1995) 11 Cal.4th 694, 755.) In *Medina*, the prosecutor repeatedly referred to defense counsel's failure to explain why witnesses saw the defendant with a handgun around the times of various robberies. (*Id.* at pp. 755–756.) Our state Supreme Court held that such comments did not implicitly refer to the defendant's silence and could "only be seen as a fair comment on the state of the evidence, comment falling outside the purview of *Griffin*." (*Id.* at p. 756.) Similarly, here "the prosecutor's comments were directed to the general failure of the defense to provide an innocent explanation" of various facts supporting the prosecution case. (*Ibid.*; *see also People v. Young* (2005) 34 Cal.4th 1149, 1195–1196 [no *Griffin* error or improper burden shifting where prosecutor highlighted lack of " 'reasonable interpretation of the evidence that leads to the defendant's innocence' "].) We tend to agree with the Attorney General that such an explanation could have been supported with evidence other than Caldwell's own testimony, such as footage from the security cameras. As a result, we are unconvinced that there was any *Griffin* error.

Although most of his discussion addresses *Griffin* error, Caldwell also claims in passing that the prosecutor's comments improperly shifted the burden of proof to the defense because they "made a direct correlation between the defense failure to [provide] reasonable explanations and proof of guilt." Caldwell does not specifically identify which comments he contends made such a correlation, but it appears he is referring to the prosecutor's statement that Dr. Shomer could not explain away various negative facts "because the defendant is guilty. When you add up all of those reasons, you only come to that conclusion."

In making this claim, Caldwell primarily relies on *Centeno*, which held that a prosecutor's "repeated[ ] suggest[ions] that the jury could find [the] defendant guilty based on a 'reasonable' account of the evidence" by the prosecution "clearly diluted the People's burden" and constituted misconduct. (*Centeno, supra*, 60 Cal.4th at p. 673, italics omitted.) *Centeno* also observed that "[t]he prosecution cannot suggest that deficiencies in the defense case can make up for shortcomings in its own." (*Ibid.*) Here, however, the prosecutor's comments cannot be reasonably interpreted as suggesting that the People had carried their burden merely because they provided a reasonable explanation of the evidence under which Caldwell was guilty or because the defense had not provided any explanation at all. Instead, the prosecutor listed the facts proving Caldwell's guilt beyond a reasonable doubt and then observed that the defense had not presented any evidence to suggest an innocent explanation for those facts. In doing so, he did not engage in improper burden shifting. (*See People v. Bradford* (1997) 15 Cal.4th 1229, 1340 ["A distinction clearly exists between the permissible comment that a defendant has not produced any evidence, and on the other hand an improper statement that a defendant has a duty or burden to produce evidence, or ... prove his or her innocence"].)

Even if the prosecutor's comments had been improper, any error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24; *see People v. Hovey* (1988) 44 Cal.3d 543, 572 [applying *Chapman* to claim of *Griffin* error].) Most indirect *Griffin* errors, as opposed to explicit mentions of a defendant's silence, are harmless, and our state Supreme Court has recognized that " 'in order for *Griffin* error to be prejudicial, the improper comment or instruction must either "serve to fill an evidentiary gap in the prosecution's case," or "at least touch a live nerve in the defense ...." ' " (*People v. Denard* (2015) 242 Cal.App.4th 1012, 1022, quoting *People v. Vargas* (1973) 9 Cal.3d 470, 481.) Here, there was no such infirmity in the prosecution's case. Three witnesses identified Caldwell at the scene, security footage captured portions of their encounter with him, and he was soon found near the restaurant with D.C.'s cell phone.

Moreover, the trial court instructed the jury under CALCRIM No. 355 that a defendant's silence is not to be considered for any purpose and under CALCRIM Nos. 103 and 220 on the People's burden of proving guilt beyond a reasonable doubt. After Caldwell objected to some of the prosecutor's comments, the court also instructed the jury that counsel's arguments did not constitute evidence. These instructions, which we presume the jury followed, mitigated any erroneous impression the prosecutor's comments could have given about either Caldwell's silence or the People's burden of proof. (*See People v. Clair* (1992) 2 Cal.4th 629, 663, fn. 8 [proper to assume "that jurors treat the court's instructions as a statement of the law by a judge, and the prosecutor's comments as words spoken by an advocate in an attempt to persuade"]; *People v. Caldwell* (2013) 212 Cal.App.4th 1262, 1274 [finding any *Griffin* error harmless based on instructions to jury].)

16

1  (ECF No. 17-6 at 92–98); Caldwell, 2017 WL 4129190, at *5–8.

2       **B. Discussion**

3       The Fifth Amendment "forbids either comment by the prosecution on the accused's

4  silence or instructions by the court that such silence is evidence of guilt." Griffin v. California,

5  380 U.S. 609, 615 (1965). Although a prosecutor's direct comment about the defendant's failure

6  to testify always violates Griffin, a prosecutor's indirect comment violates Griffin only "if it is

7  manifestly intended to call attention to the defendant's failure to testify, or is of such a character

8  that the jury would naturally and necessarily take it to be a comment on the failure to testify."

9  Lincoln v. Sunn, 807 F.2d 805, 809 (9th Cir. 1987); see also United States v. Hasting, 461 U.S.

10  499, 515 (1983) (Stevens, J., concurring) (noting that Griffin did not "cut back on the area of

11  legitimate comment by the prosecutor on the weaknesses in the defense case"); Lockett v. Ohio,

12  438 U.S. 586, 595 (1978) (holding that the prosecutor's closing remarks regarding the

13  "unrefuted" and "uncontradicted" evidence did not violate defendant's constitutional rights).

14  Courts have "distinguished, however, between permissible 'comments about the lack of

15  explanation provided by the *defense*" and impermissible 'comments about the lack of explanation

16  furnished by the *defendant*.'" Demirdjian v. Gipson, 832 F.3d 1060, 1067 (9th Cir. 2016)

17  (quoting United States v. Mayans, 17 F.3d 1174, 1185 (9th Cir. 1994)); see also Cook v. Schriro,

18  538 F.3d 1000, 1020–21 (9th Cir. 2008); United States v. Mende, 43 F.3d 1298, 1301 (9th Cir.

19  1995) ("There is a distinction between a comment on the defense's failure to present exculpatory

20  evidence as opposed to a comment on the defendant's failure to testify."). Under AEDPA, a

21  federal habeas court is prohibited from "treating a prosecutorial statement as error if 'there is any

22  reasonable argument' to the contrary." Demirdjian, 832 F.3d at 1067 (quoting Richter, 562 U.S.

23  at 410).

24       Here, the state courts' rejection of petitioner's Griffin error claim was not contrary to, nor

25  an unreasonable application of, clearly established federal law. The prosecutor did not directly

26  attack petitioner for failing to testify. Nor were the prosecutor's arguments an impermissible

27  indirect attack intended to call attention to petitioner's decision to remain silent. Instead, there is a

28  reasonable argument that the prosecutor's statements were about the state of the evidence.

Specifically, the prosecutor noted the absence of an alternative and reasonable explanation for defendant's presence in the area and the victim's cellphone in his car, and that "[t]here is no evidence of defendant being anywhere else." (ECF No. 17-5 at 126, 129–30, 154–55.) Such comments about the lack of exculpatory evidence did not violate petitioner's constitutional rights.

Petitioner claims that the prosecutor's remarks were improper because he was the only person that could provide an explanation. The Ninth Circuit has applied this logic in cases where the prosecutor has clearly singled out the defendant. For example, in Sehnal, the court found that the prosecutor erred because he posed questions to the defendant in closing argument. United States v. Sehnal, 930 F.2d 1420, 1425 (9th Cir. 1991). And in Lincoln, the court held that there was prosecutorial misconduct because the prosecutor made multiple improper references to the "only one [other] person" who could explain the events, implicitly referring to the defendant who had invoked his right to remain silent. Lincoln, 807 F.2d at 809; see also Hovey v. Ayers, 458 F.3d 892, 912 (9th Cir. 2006).

Here, the prosecutor's closing remarks did not single out the petitioner; they were general comments about the state of the evidence. (ECF No. 17-5 at 126 ("And finally, there is no evidence of him being anywhere else. The only evidence you have is that he was a Buffalo Wild Wings."); id. at 129–30, 154–55 (stating that the defense's expert cannot explain why the phone was found in defendant's car, defendant was in that parking lot that night, defendant was sweating, and defendant matched the robber's description).) Furthermore, as the state appellate court noted, defense counsel could have introduced other evidence besides petitioner's testimony to provide an innocent explanation to these outstanding queries. He did not. Because comments highlighting defense counsel's failure to explain incriminating evidence or provide exculpatory information do not arise to a Griffin error, this claim fails.[4] See Demirdjian, 832 F.3d at 1068; United States v. Mayans, 17 F.3d 1174, 1186 (9th Cir. 1994).

Even if the prosecutor did make an improper comment, reversal is not warranted. The harmless error rule applies to Griffin violations. Chapman v. California, 386 U.S. 18, 24 (1967).

---

[4] Because this claim fails on the merits, this court does not resolve the parties dispute as to whether petitioner preserved his claim.

18

Reversal is warranted only if the error is not harmless, meaning "where such comment is extensive, where an inference of guilt from silence is stressed to the jury as a basis of conviction, and where there is evidence that could have supported acquittal." Anderson v. Nelson, 390 U.S. 523, 524 (1968) (per curiam); see also Mayans, 17 F.3d at 1185 ("[R]eversal is warranted only where it appears that the comment may possibly have affected the verdict."). There was other evidence to support a guilty verdict including three witness identifications after the incident, petitioner's proximity to the scene while in possession of the stolen phone, and petitioner's behavior was consistent with attempting to escape the police detection.

Furthermore, courts are reluctant to reverse a judgment where the prosecutorial comment "was a single isolated statement, did not stress an inference of guilt from silence as a basis for conviction, and was followed by curative instructions." United States v. Soulard, 730 F.2d 1292, 1307 (9th Cir. 1984) (citation omitted). The trial record contains several instructions regarding defendant's right to remain slight and the government's burden of proof. Before closing arguments, the court instructed the jury that a defendant is presumed innocent, and this presumption requires the prosecutor to prove defendant is guilty beyond a reasonable doubt. (ECF No. 17-5 at 95–96.) "Do not consider for any reason at all the fact that the defendant did not testify…do not discuss that fact during your deliberations or let it influence your decision in any way." (Id. at 105.) The court also instructed that "[n]othing the attorneys say is evidence," including their opening and closing statements. (Id. at 96.) During closing arguments, the court reminded the jury that the lawyers remarks are not evidence. See, e.g., ECF No. 17-5 at 128, 144, 146, 154.) Courts presume that juries follow the jury instructions. Hovey, 458 F.3d at 913; Boyde v. California, 494 U.S. 370, 384 (1990) ("But arguments of counsel generally carry less weight with a jury than do instructions from the court…[which] are viewed as definitive and bindings statements of law.") This court finds no reason to depart from this presumption here.

Lastly, petitioner argues that the prosecutor impermissibly shifted the burden of proof to defendant in his closing statement by inviting the jury to consider petitioner's "failure to explain" as proof of guilt. The relevant inquiry is whether the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v.

Wainwright, 477 U.S. 168, 181 (1986) (citation omitted); Donnelly v. DeChristoforo, 416 U.S. 637, 647 (1974) ("[A] court should not lightly infer that a prosecutor intends an ambiguous remark to have its most damaging meaning or that a jury, sitting through lengthy exhortation, will draw that meaning from the plethora of less damaging interpretations"). Courts have rejected similar arguments where the prosecutor's comments did not "expressly or implicitly shift[] the burden of proof," and the prosecutor "expressly told the jury the burden of proof was on the government." Demirdjian, 832 F.3d at 1071 (quoting United States v. Vaandering, 50 F.3d 696, 702 (9th Cir. 1995)). In this case, the prosecutor made clear to the jury that the government had the burden of proof. (ECF No. 17-5 at 130, 152–53; see also id. at 139, 145 (defense counsel stating that standard is beyond a reasonable doubt and defendant does not have to prove his innocence).)

The prosecutor's statements also did not expressly or implicitly shift that burden to the defense. Rather, the prosecutor provided several reasons why the jury should find petitioner guilty. (ECF No. 17-5 at 118–30 (including petitioner's possession of the stolen phone, witness identifications, petitioner matches witnesses' description of robber and robber's physical appearance on surveillance video, and petitioner's location and demeanor at time of arrest).) Assessing his claim under AEDPA, a fairminded jurist could conclude that the prosecutor's statements intended to highlight the lack of exculpatory evidence, not shift the burden of proof. Because the state appellate court could have reasonably concluded there was no burden shifting, this court recommends denying relief on this claim.

## CONCLUSION

Petitioner fails to meet the standards set out in 28 U.S.C. § 2254(d) by showing the state court decision on any claim was contrary to or an unreasonable application of clearly established law as determined by the Supreme Court, or resulted in a decision based on an unreasonable determination of the facts.

Further, it is RECOMMENDED that petitioner's petition for a writ of habeas corpus (ECF No. 1) be denied.

/////

1    These findings and recommendations will be submitted to the United States District Judge

2    assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within thirty (30) days

3    after being served with these findings and recommendations, any party may file written

4    objections with the court and serve a copy on all parties.  The document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6    shall be served on all parties and filed with the court within seven (7) days after service of the

7    objections. Failure to file objections within the specified time may waive the right to appeal the

8    District Court's order. Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951

9    F.2d 1153 (9th Cir. 1991). In the objections, the party may address whether a certificate of

10   appealability should issue in the event an appeal of the judgment in this case is filed. See Rule 11,

11   Rules Governing § 2254 Cases (the district court must issue or deny a certificate of appealability

12   when it enters a final order adverse to the applicant).

13   Dated: January 13, 2022

14

15

16   DEBORAH BARNES
     UNITED STATES MAGISTRATE JUDGE

17

18

19

20

21

22

23

24

25

26

27

28